**SIGNED this 28th day of November, 2008.**

_____
**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

**Western District of Texas**
**San Antonio Division**

| | |
|---|---|
| IN RE | BANKR. CASE NO. |
| CLARK CONTRACTING SERVICES, INC. | 08-50046-LMC |
| *DEBTOR* | CHAPTER 11 |
| CLARK CONTRACTING SERVICES, INC. | |
| *PLAINTIFF* | |
| V. | ADV. NO. 08-5045-LMC |
| WELLS FARGO EQUIPMENT FINANCE | |
| *DEFENDANT* | |

## MEMORANDUM OPINION REGARDING
### THE PARTIES' RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT

Before the court are the defendant's motion for partial summary judgment and the plaintiff's response and cross-motion for summary judgment. The facts are not in material dispute. The only question of law raised by the two motions is what, if anything, chapter 501 of the Texas

Transportation Code (hereinafter the "Certificate of Title Act")[1] requires of a lienholder in order to perfect an assigned lien. The issue is relevant because the debtor-in-possession ("debtor"), exercising the strong arm powers in section 544(a), seeks to avoid the liens of Wells Fargo Equipment Finance ("Wells Fargo") on certain vehicles, liens that Wells Fargo obtained by assignment from CIT Group/Equipment Financing, Inc. ("CIT"). For the reasons that follow, the court will deny the defendant's motion and grant partial summary judgment in favor of the plaintiff, holding that, to be effective against a hypothetical judgment creditor, the assignee of a lien on vehicles governed by the Texas Certificate of Title Act must take the affirmative steps set out in that enactment to have their identity as lienholder reflected on the certificates of title. .

## I. BACKGROUND

Clark Contracting Services, Inc. is a construction company that provides contracting services related to the clearing and paving of land and pad sites for commercial developments. Facing potential foreclosure actions by a number of creditors, the Clark Contracting commenced a chapter 11 bankruptcy case on January 9, 2008, becoming a debtor-in-possession. Then, on April 1, 2008, the debtor-in-possession filed this adversary proceeding seeking to avoid several liens held by defendant Wells Fargo Equipment Finance ("Wells Fargo"), using the strong-arm powers of section 544(a) of the Bankruptcy Code.[2] The debtor contends that Wells Fargo failed to perfect many of these liens under applicable state law in a manner sufficient to prevail over a hypothetical judgment lien creditor with a returned execution as of the date of the commencement of the case. No one disputes that CIT was noted on the certificates of title as lienholder as of that date, and that Wells

---

[1] *See* TEX. TRANSP. CODE §§ 501.001 et Seq. (2008).

[2] *See* 11 U.S.C. § 544(a) (2008).

Fargo was not.

Wells Fargo is seeking partial summary judgment that six of the disputed liens are valid, enforceable, and not avoidable under section 544(a). Wells Fargo explains that it acquired these six duly perfected liens by assignment from CIT Group/Equipment Financing, Inc. ("CIT"), and that it did not need to take any further action to maintain that perfection, because the UCC does not require assignees to take any additional steps to perfect liens that were already duly perfected by the assignor prior to assignment.

The debtor originally granted the six liens to CIT in 2005 by executing a Master Security Agreement through which CIT agreed to finance several of the debtor's future purchases of construction equipment for use in the debtor's business. On December 4, 2006, CIT advanced funds to the debtor under the Master Security Agreement for the purchase of a Rosco Maximizer 3 asphalt distributor mounted on a 2007 IHC Model 7300 truck (the "Asphalt Truck"). CIT filed a UCC-1 financing statement for that transaction with the Secretary of State on the same date, and, shortly thereafter, CIT applied for and obtained a certificate of title listing its lien on the certificate of title for the Asphalt Truck.

On January 30, 2007, CIT advanced additional funds under the Master Security Agreement. This second loan financed the debtor's purchase of five 2007 Ford F750 trucks with Ledwell 2000 gallon water tanks (the "Water Trucks"). As in the first transaction, CIT filed a UCC-1 financing statement with the Secretary of State. Also, as in the first transaction, CIT applied for and obtained certificates of title, listing CIT's liens on the titles for each vehicle. Neither party disputes the validity or the perfection of CIT's liens on the Asphalt Truck or the five Water Trucks.

On June 21, 2007, Wells Fargo purchased CIT's notes and security interests with respect to

the six motor vehicles described above.[3] The debtor does not dispute the validity or enforceability of that assignment transaction. The debtor does challenge Wells Fargo's claim that its liens are sufficiently perfected under applicable state law so as to prevail over the competing claim of a judgment creditor who obtains execution of its judgment *i.e.* a "judgment lien creditor"). If they are not so perfected, then, under section 544(a), the liens may be avoided. Thus, for purposes of this dispute, perfection is the whole ball game.

## II. THE ARGUMENTS OF THE PARTIES

The crux of the debtor's argument is simple. According to the debtor, the UCC defers to the Texas Certificate of Title Act on matters such as perfection, and the latter enactment requires an affirmative act by an assignee to maintain lien perfection.[4]

Wells Fargo acknowledges that its liens are subject to the Certificate of Title Act, but argues that the Certificate of Title Act does not expressly require recordation of *assigned* liens. When Wells Fargo acquired the liens from CIT in 2007, Wells Fargo elected not to record the assignment (though it could have done so pursuant to provisions for the recordation of assignments in the Certificate of Title Act).[5] Wells Fargo instead chose to simply hold the existing certificates that reflect CIT as the

---

[3] *See* Wells Fargo's Motion for Summary Judgment, Adv. Proc. No. 08-5045-lmc, Dkt. No. 9, Exs. M-9, M-10, M-11.

[4] *See* TEX. TRANSP. CODE §§ 501.001 et Seq. (2008); *see also* TEX. BUS. & COMM. CODE §§ 9.101 et Seq. (2008). More specifically, subchapter F of the Certificate of Title Act contains the statutory scheme for creditors to obtain and perfect liens on motor vehicles not held by the debtor as inventory. The Certificate of Title Act is important in light of section 9.311(a)&(b) of the Texas Business and Commerce Code (or more commonly known as the UCC). For ease of reference in this opinion, references to any provision of the UCC shall be construed as a reference to the Texas Business and Commerce Code. Likewise, references to the Certificate of Title Act shall mean chapter 501 of the Texas Transportation Code.

[5] *See* TEX. TRANSP. CODE, § 501.114 (Vernon 2007). Had it followed the procedure laid out in section 501.114, Wells Fargo would have received new certificates of title reflecting Wells Fargo as the lienholder, in place of CIT. *See id.*, at §§ 501.114(d)(2), 501.027. All agree that, had such a procedure been followed, Wells Fargo's lien position *vis-a-vis* judgment lien creditors holding executed returns would have been unassailable, and Wells Fargo would thus have had no exposure to liability under section 544(a).

- 4 -

lienholder, relying on the more general rule stated in section 9.310(c) of the Texas version of the UCC that assignees need take no further action to enjoy the perfected status of their assignors. As a result of this choice, however, the Texas Department of Transportation was not (and would not have been) aware of the existence of Wells Fargo as alienholder – its records would still reflect CIT as the lienholder with respect to these vehicles.[6] Wells Fargo did file amendments to the existing UCC-1 financing statements as precautionary matter, but maintains that even that action was not necessary. Wells Fargo contends that the provision for recordation of assignments found in section 501.114 of the Certificate of Title Act is permitted, but not required. Indeed, says Wells Fargo, this provision of the Certificate of Title Act actually conflicts with section 9.310(c) of the UCC, and the UCC must control.[7]

The debtor counters that section 9.310(c) of the UCC is the wrong place to look. That section, says the debtor, is only a general rule regarding assignment of ordinary liens. The right place to look is section 9.311 of the UCC, says the debtor, which refers holders of liens on vehicles to the Texas Certificate of Title Act. There, says the debtor, the lienholder will be instructed that liens on motor vehicles can be perfected *only by* recording the lien *on the certificate of title* in *some* fashion described by the Act. *See id.* § 501.111(a) (emphasis added). The debtor then points out that, because of this unique procedure for recordation (as opposed to a public records filing that can be easily inspected by third parties), the Certificate of Title Act also instructs lienholders on how to properly assign perfected liens on motor vehicles in a way that will maintain that perfection,

---

[6] *See* Tex. Transp. Code, § 501.114(d) (stating that the Department of Transportation, on receipt of an application for assignment of lien, may amend its records "to substitute the subsequent lienholder for the previous lienholder").

[7] *See* Tex. Transp. Code § 501.005 ("Chapters 1-9, Business & Commerce Code, control over a conflicting provision of this chapter").

including a specific procedure for making sure that the assignee is properly identified as the current holder of the lien by notation on a newly issued certificate of title. The debtor claims that the Act is clear, unambiguous, and in fact does *not* conflict with the UCC. Nor, says the debtor, can the provisions of the Certificate of Title Act be viewed as permissive. Wells Fargo, says the debtor, chose to ignore the procedures in the Certificate of Title for notating its assigned liens on the certificates of title for these vehicles, and so was left unperfected on the petition date – because Wells Fargo was not shown as the current lienholder on the certificates of title for these vehicles, nor was it known to the Department of Transportation as the lienholder of right. Thus, says the debtor, Wells Fargo would lose in a contest with a judgment lien creditor. As such, concludes the debtor, the liens must be avoidable under section 544(a).[8]

The dispute thus turns on how the UCC and the Certificate of Title Act interact with respect to the assigned liens on motor vehicles. Both parties acknowledge the lack of Texas case law interpreting the relevant provisions of the Certificate of Title Act. The court's own research has turned up few helpful opinions in Texas on the issue. Nonetheless, a careful application of the rules of statutory construction leads this court to conclude that the Certificate of Title Act was enacted specifically to ensure that assigned liens on vehicles subject to the Certificate of Title Act must be reflected on the certificates of title as a condition to continuous perfection. Failure to comply with the Act may result in a lien becoming unperfected as against a third party judgment lien creditor following the assignment of that lien. Wells Fargo's liens were unperfected as of January 9, 2008 (the date of the debtor's petition) because they were nowhere notated on the certificates of title.

---

[8] The debtor is acting as a debtor-in-possession, *see* 11 U.S.C. § 1107, and so has the same strong-arm powers the trustee has under section 544(a). *See Gandy v. Gandy (Matter of Gandy),* 299 F.3d 489, 497 (5th Cir. 2002) (citing *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. (In re Nat'l Gypsum Co.),* 118 F.3d 1056, 1068 (5th Cir. 1997)).

They are thus avoidable under section 544(a) of the Bankruptcy Code. Summary judgment will be granted in favor of the plaintiff-debtor, and Wells Fargo's motion should be denied.[9]

## II. JURISDICTION

This matter arises under a provision of title 11 of the United States Code, and thus falls within the subject matter jurisdiction conferred by section 1334(b) of title 28. While the court looks to state law to resolve the issue of perfection under the Certificate of Title Act and the UCC, the debtor's avoidance power arises under the Bankruptcy Code, and this type of dispute could arise only in the context of a bankruptcy case. *See In re Gandy,* 299 F.3d at 497. Accordingly, subject matter jurisdiction is proper under section 1334(b) of title 28. *See* 28 U.S.C. § 1334(b); *see also Geruschat v. Ernst & Young, LLP (In re Seven Fields Dev. Corp.),* 505 F.3d 237, 263 (3d Cir. 2007). Furthermore, because jurisdiction exists under these narrower categories of bankruptcy jurisdiction, involving an exercise of a trustee's chapter 5 powers and a subordinate determination of the extent, validity, and priority of Wells Fargo's liens, this is a core proceeding for which this court may hear and make final determinations. *See id.*; *see also* 28 U.S.C. §§ 157(b)(1)&(b)(2)(K). Finally, venue is proper under section 1409(a) of title 28.

---

[9] It is appropriate to note here that the court granted Wells Fargo relief from the automatic stay on April 30, 2008, to allow Wells Fargo to foreclose on these vehicles. This relief was granted *not* based on the validity of Wells Fargo's liens, but instead based on the court's understanding that the debtor could not provide any sort of adequate protection *and* the understanding that the debtor could always recover the vehicles or the value of the vehicles if it was successful in this litigation. *See* 11 U.S.C. § 550(a). During a recent hearing, counsel for the debtor informed the court that Wells Fargo may have sold the vehicles through foreclosure proceedings. Based on this court's ruling on the cross-motions for summary judgment, the debtor is free to use its remedies for recovering the value of these vehicles. That issue, however, is not yet before the court.

### III. DISCUSSION

#### A. *Avoidance Under Section 544(a)*

The Bankruptcy Code provides a trustee with certain "strong-arm" powers to avoid unperfected pre-petition transfers made by the debtor of interests in property. *See* 11 U.S.C. §§ 544(a), 1107. To do this, section 544(a) grants to the trustee the powers of a hypothetical judgment lien creditor deemed to be perfected on the date of petition. *See* 11 U.S.C. § 544(a)(1). Thus, any lien that would be vulnerable or subordinate to such a hypothetical judgment lien creditor, such as, by way of example, a lien that is not perfected as of the petition date, is avoidable under section 544(a)(1). The debtor-in-possession (DIP) in a chapter 11 case can exercise this trustee power. *See NetBank, FSB v. Kipperman (In re Comm. Money Center, Inc.),* 350 B.R. 465, 474 (9th Cir. B.A.P. 2006); *see also* 11 U.S.C. § 1107.

In the present case, the debtor contends that six of the liens held by Wells Fargo were not perfected as against a perfected judgment creditor as of the petition date. Wells Fargo contends that its liens are and have always been sufficiently perfected since CIT first perfected its liens in accordance with the Certificate of Title Act. The facts are not in dispute, and the law regarding a trustee's power to avoid unperfected security interests is well-settled, the only issue for this court to determine is whether Wells Fargo's liens were perfected as against a hypothetical judgment creditor with a fully perfected judgment lien as of January 9, 2008, the date the debtor commenced the related bankruptcy case. For that determination, we turn to applicable state law.

#### B. *Perfection of Security Interests in Motor Vehicles Under Texas Law*

As a general rule, a security interest in most types of personal property is perfected by filing a financing statement with the Secretary of State. *See* TEX. BUS. & COMM. CODE § 9.310(a). Also

generally speaking, the assignment of a duly perfected security interest does not affect the perfection status of that security interest. *See id.* § 9.310(c). If a financing statement was filed by the assignor, for example, the assignee would enjoy the benefit of that lien remaining continuously perfected through the assignment without any additional filing requirements. *See id.* These general rules, however, are not without exception. No filing is necessary to perfect certain types of collateral, such as certain certificated securities, documents, goods, instruments, deposit accounts, electronic chattel paper, investment property, or letter-of-credit rights. *See, e.g., id.* § 9.310(b)(5), (b)(8), (b)(9).[10]

Where the collateral is a motor vehicle, the UCC prescribes a completely different set of rules for perfection. *See id.* §§ 9.310(b)(3), 9.311(a). The filing of a financing statement for perfection of liens on certificated motor vehicles is wholly ineffective. *Id.* The perfection of security interests in such collateral is governed by the Texas Certificate of Title Act. *See id.*; *see also* TEX. TRANSP. CODE §§ 501.111-.116. The Act requires a separate certificate of title for each vehicle, reflecting the Department of Transportation's records. The certificate must list, among other things, the name and address of each party asserting lien rights in the vehicle, listed chronologically according to the date on which each lien was first recorded. *See* TEX. TRANSP. CODE § 501.021(b).

The rules for perfecting a motor vehicle lien under the Act are quite unlike the general perfection rules under the UCC. Rather than relying on a generally searchable database, the perfection scheme relies on physical notation of security interests on the very document required to

---

[10]The logic of this scheme of perfection is straightforward. A recording system searchable by the public is, for most types of personal property collateral, both reliable and inexpensive. A subsequent lender or buyer need only search those records, under the name of the grantor of the security interest to determine whether a pre-existing interest might prime the interest the lender or buyer is about to acquire. Special rules protect buyers of certain kinds of items, such as consumers buying goods in the ordinary course of business. Special rules also apply to certain kinds of collateral whose nature is such possession is a surer, more logical, and less expensive means of perfection. With respect to certain unique types of collateral, however, special rules might come into play, in service to other public policy interests. The perfection of certain interests in intellectual property is one such example. As we shall see later in this opinion, the perfection of interests in certificated motor vehicles is another. *See generally*

legally transfer a motor vehicle. This scheme reflects the Act's larger purpose to assure the ability

to sell vehicles without the need of enforced disclosure to the purchaser of the existence of a lien on

the vehicle. *See* Tex. Transp. Code, § 501.003.[11] Adds a recent commentator, with regard to the

difference in approaches between the UCC and the Certificate of Title Act:

> Article 9 was intended in large part to wire around the historical aversion to
> non-possessory security interests in personal property--the secret lien problem.
> [citing 1 GRANT GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY § 9.1
> (1965)]. [Certificate of Title] laws were intended to prevent the theft of certain
> personal property that, because of its peculiar nature (ease of movement between
> jurisdictions), was especially vulnerable to theft. [citing *inter alia* Fairfax Leary, Jr.,
> *Horse and Buggy Lien Law and Migratory Automobiles*, 96 U. PA. L. REV. 455
> (1948)]. Because the property subject to certificate of title acts was also a common
> form of collateral in secured financing, conflicts were inevitable.

Larry T. Bates, *Certificates of Title in Texas Under Revised Article 9*, 53 BAYLOR L. REV. 735, 736

(Fall 2001). Professor Bates notes that a plea was made to expressly preempt state certificate of title

laws when revised article 9 was under consideration, but that that plea was rejected. *Id.*, at 740.[12] In

---

[11] Says the statute:

This chapter shall be liberally construed to lessen and prevent:
  (1) the theft of motor vehicles;
  (2) the importation into this state of and traffic in motor vehicles that are stolen; and
  (3) the sale of an encumbered motor vehicle without the enforced disclosure to the purchaser of a lien
  secured by the vehicle.

TEX. TRANSP. CODE, § 501.003 (Vernon 2007).

[12] Explains Prof. Bates:

Of course this was no more acceptable in 1994 than it would have been when original Article 9 was
conceived. 24 The PEB [Permanent Editorial Board] and its drafting committees had to accept the
existence of competing systems for titled collateral and find a way to integrate the COT [Certificate
of Title] acts into Revised Article 9 with minimal displacement of creditors' expectations-at least under
Article 9.

Revised Article 9 simplifies the choice of law rule for titled collateral by making the location of
collateral, the movement of collateral, the registration of collateral, and the surrender of certificates
not relevant to the choice of law determination. Revised Article 9 also modifies the substantive rules
that affect perfection and priority when the choice of law rule requires a change in the law governing
titled collateral. In Texas, the effect of these changes to Article 9 on transactions that involve titled

short, only notation on the certificate of title will count for purposes of notifying third parties – be they purchasers, lenders, or judgment creditors – of the existence and identity of a given lienholder. Professor Bates in fact explains that, when a vehicle is converted into money or other proceeds, the lienholder will not enjoy "continued perfection" in proceeds without further action that it otherwise does not have to take with respect to types of collateral that are perfected under the provisions of the UCC itself:

> ... [E]quating notation on a certificate of title with filing a financing statement will cause proceeds to remain perfected for more than twenty days only if a financing statement covering the proceeds would be filed in the same office as the financing statement covering the original collateral. But since no financial statement was actually filed [with respect to certificated motor vehicles], a filing covering the proceeds would necessarily be filed in a different office. And even if the proceeds were titled collateral, a financing statement would not be sufficient to perfect a security interest in such collateral. Thus, the hypothetical filing would not be effective to perfect the security interest in the proceeds even if we reversed the fiction and equated the hypothetical financing statement with notation on the original COT. The original COT would be effective only to cover the original car since certificates of title are vehicle specific. Thus, a security interest in the proceeds of titled collateral will not be perfected for more than twenty days unless the secured party takes whatever action is necessary to perfect a security interest in the proceeds themselves.

Bates, at 751-752. A failure to notate a continuing security interest correctly on the certificate of title can thus be fatal to perfection for a secured creditor. By the same token, the level of diligence imposed on innocent third parties is low – they are entitled to rely on what appears on the certificate

---

collateral will depend on which COT Act applies to the collateral because the Texas COT Acts differ in their requirements and their scope. These differences within the state of Texas itself illustrate some of the difficulties that result on the national level from the non-uniformity of COT acts generally.

Bates, at 740-741 Of special note here is that Revised Article 9 limited its incursion into Certificate of Title statutes to situations in which choice of law problems might be created as between different states. The assignment of a security interest with respect to vehicles which themselves have not moved outside the state of Texas raises no choice of law issues. Later in his article, after an extended discussion of what might happen to a vehicle that starts in Texas and ends in Oklahoma (and the impact that changes in Revised Article 9 might have on various permutations of that move), the author says, "Putting the pieces together, we can see that generally perfection of a security interest in goods subject to a COT statute can only be accomplished by complying with the terms of the applicable COT statute." Bates, at 749.

- 11 -

of title, and need look no further. Indeed, there is nowhere else *to* look because a searchable databases of filings is not publicly available.

The Act expressly states that notation on the certificate of title equals perfection of the lien, and the method of achieving that notation is specifically laid out in the Act. *See id.* §§ 501.113, 501.111(a). In the ordinary case, a lien may be perfected by notifying the county assessor-collector of the lien. *Id.* Once the assessor-collector receives verification of the lien (and a filing fee), it forwards the information to the Department of Transportation, which records the lien and issues a new certificate of title on which the lienholder is specifically identified, by name and address, on the face of the certificate itself. with that lien listed on the certificate. *Id.*

Our unique problem arises not with the original perfection of a lien, but with its *continued* perfection once it has been assigned. However, the basic principles that underlay the scheme of perfection (and thereby notice to third parties) in the special context of motor vehicles points strongly to the conclusion that assignments too must be notated on the certificate of title if the lienholder's claim is to be effective against innocent third parties such as judgment creditors. What is more, the public filing system used for the perfection of most other kinds of collateral makes the general rule in 9.310(c) a sensible one for that context – but also strongly suggests that the same general rule would have limited utility in a notational system like that used for motor vehicles, where there is no publicly searchable database on which parties are directed to rely.

The Certificate of Title Act lays out a specific procedure for how to handle the assignment of lien interests in motor vehicles. That procedure includes a mechanism for notating the identity of the assignee on the certificate of title. *See id.* § 501.114.[13] It is worth recalling here, that physical

---

[13] Here is the provision in its entirety:

(a) A lienholder may assign a lien recorded under Section 501.113 by:

notation on the face of the certificate of title is the Act's selected mode for notifying third parties

of the existence of a prior lien, so a procedure that specifically spells out how to make sure that the

assignee is reflected as the correct lienholder on the face of the title is consistent with the larger

scheme of perfection adopted in the Certificate of Title Act. The original lienholder, we are told

may[14] assign a lien that has been recorded in accordance with the Act's procedures for notating liens

on certificates of title.[15] To do that, the assigning lienholder must (1) notify the debtor of the

----

(1) applying to the county assessor-collector for the assignment of the lien; and
(2) notifying the debtor of the assignment.
(b) A lienholder's failure to notify a debtor of an assignment does not create a cause of action against the lienholder.
(c) An application under Subsection (a) must be:
(1) signed by the person to whom the lien is assigned; and
(2) accompanied by:
(A) the applicable fee;
(B) a copy of the assignment agreement executed by the parties; and
(C) the certificate of title on which the lien to be assigned is recorded.
(d) On receipt of the completed application and fee, the department:
(1) may amend the department's records to substitute the subsequent lienholder for the previous lienholder; and
(2) shall issue a new certificate of title as provided by Section 501.027.
(e) The issuance of a certificate of title under Subsection (d) is recordation of the assignment. The time of recordation of a lien assigned under this section is considered to be the time the lien was recorded under Section 501.113.

*Id.* § 501.114. While the drafting of this provision, like most pieces of legislation, could always have been improved, its meaning remains clear — especially when the section is read from end-to-beginning, *i.e.*, starting with subsection (e) and reading back up, following the subsection references within the statute.

[14]*See* TEX. TRANSP. CODE, § 501.114(a). Wells Fargo argues that the use of the word "may" here means that the procedure laid out in this section is merely optional. However, as discussed *infra*, the permission here granted can equally be read as granted to the *assignor*. That is, lienholders are allowed to assign their liens, *provided* they follow the procedures set out in this section. If Wells Fargo's argument were valid, then the "perfection option" laid out here (if we were to treat it as such) would be expected to have been granted to the *assignee*, rather than the *assignor*. After all, it is the *assignee*, not the assignor, that has the vested interest in continued perfection of the lien position that it is acquiring by assignment. However, the statute does not apply "may" to the assignee – it applies "may" to the assignor.

[15]The Act lays out the procedures for notating (or "recording") a lien in the immediately previous section, section 501.113. *See* Tex. Transp. Code, § 501.113.

assignment[16] and (2) submit an application for recordation with the county assessor collector once

again. *Id.* The application submitted to the assessor-collector must be signed *by the person to whom the lien is assigned – i.e.*, the assignee must sign the application. A copy of the executed assignment

agreement must also be submitted, proof that the lien currently recorded on the records of the

Department of Transportation will no longer be owned by the lienholder there originally reflected.

The original of the certificate of title (which should be in the possession of the assignor) must also

be submitted to the Department. *See id.* § 501.114(c). Once the completed application is remitted

to the Department of Transportation, the Department then issues a new certificate of title, showing

the assignee as the new current lienholder of record. *See id.* § 501.114(d). The new certificate of title

is sent to the first lienholder disclosed on the application – namely, the assignee. *See id.* §§

501.114(d)(2); 501.027(b). At this point then, the assignee should be in possession of the newly

issued original certificate of title, now reflecting the assignee as first lienholder. Also, at this point,

the assignee's lien is now perfected because, in the language of the statute, the certificate of title

issued under subsection (d) of section 501.114 "is recordation of the assignment." *See id.*, §

501.114(e). In addition, the assignee now enjoys the benefit of a "relation-back" perfection, because

"the time of the recordation of a lien assigned under this section[17] is considered to be the time the

lien[18] was recorded under Section 501.113." *See id.* Section 501.113, it will be recalled, tells us that

"recordation of a lien under [the Certificate of Title Act] is considered to occur when the county

---

[16]Interestingly, the statute tells us that, if the assigning lienholder fails to tell the debtor about the assignment, the debtor does not have a cause of action back against the assignor for not telling him or her about the assignment. *See* TEX. TRANSP. CODE, § 501.114(b). The statute says nothing about any duty, one way or another, to notify third party purchasers, subsequent lenders, or judgment creditors of the assignment.

[17]In this case, that would be the first lien originally granted to CIT.

[18]Again, that would be CIT's lien, now assigned to Wells Fargo.

- 14 -

assessor-collector is presented with an application for a certificate of title that discloses the lien." *See id.* § 501.113(a)(1). What is more, the time of recording a lien in this fashion "is considered to be the time of filing the security interest" for purposes of Article 9 of the UCC. *See id.*, § 501.113(b).

Read *in pari materia*, then, the intent of the Certificate of Title Act seems clear. An assignee who wants to be assured that its lien will "relate back" to the recordation date of the original lien by the assignor needs to follow the procedures set out in this section. What is more, only by following this procedure will the Department of Transportation know that the assignee is the current holder of the first lien. Otherwise, the assignee will find itself holding the original certificate of title, but that certificate will not show the assignee as the record lienholder. The only recognized means of perfection in the Act, namely notation on the face of the title of the name and address of the current lienholder, seems fairly obviously to imply that an assignee who wants to be able to stand in the shoes of its assignor with continued perfection needs to be make sure that the assignee is shown on the face of the certificate of title, with a proper name and address. There is no other means of perfection available under the Act, and none other is even implied. *See id.*, §§ 501.021(a)(7)(B), 501.003(3).[19] Perfection of security interests in certificated motor vehicles imposes no particular due diligence on a third party, because the mechanism for warning innocent third party purchasers of a pre-existing security interest hinges entirely on what's on the certificate of title itself. *See id.* §§ 501.021(b)(7); § 501.113(a). Thus, just a cursory examination of the statute's structure alone

---

[19]The statutes says that a motor vehicle certificate of title is an instrument issued by the Department of Transportation that includes, *inter alia*, a statement "of the *name and address of each lienholder* and the date of each lien on the vehicle." *Id.* If the lien is assigned without compliance with section 501.114, then the certificate will no longer accurately reflect "the name and address" of the lienholder. This might not matter but for the fact that, for purposes of *perfection* of liens on motor vehicles, the sole method of perfection is proper notation on the certificate of title. *See* TEX. BUS. & COMM. CODE § 9.311(b).

supports the conclusion that, for an assignee to enjoy its assignor's lien position, it needs to follow the procedure laid out in section 501.114 of the Act.[20]

Because of the importance of the correctness of the information on the certificate of title itself to innocent third parties acquiring the vehicle, the statute may be understood as an *authorization* to assign liens, *provided that* the parties to the assignment follow the procedures laid out there. The statute expressly states "a lienholder may assign a lien ...." *See id.*, § 501.114(a). The authorization is given to the *assignor*. If the statute were to mean what Wells Fargo suggests (*i.e.*, that "may" means that the assignee has the option of not complying with these procedures, the option of doing nothing), then the statute would apply the permissive "may" not to the assignor but to the *assignee*, the party who expects to be the beneficiary of its assignor's perfection. What is more, the word "may" would not authorize assignment as such but rather a means of recording the assignment. It might, for example, read something like this: "The assignee of a lienholder whose lien is recorded under section 501.113 may record its assignment by:"

Instead, the statute says that the *assignor* is allowed to assign its lien, then spells out the procedure for doing so. The procedures in the statute are all aimed at the same problem – assuring that the certificate of title contains the correct information about who currently holds liens against the vehicle, information essential in a scheme that relies on the certificate of title itself for purposes of transferring an interest in the vehicle to third parties. *See id.*, § 501.003. The assignor and assignee need to furnish proof to the Department of Transportation that the lien has in fact been

---

[20]It bears repeating that, for motor vehicles, there is no publicly searchable database for liens. For other kinds of goods and equipment, of course, the UCC *does* have such a system, and a rule that says an assignee need take no further steps to perfect makes sense when a third party is required to consult that public filing system to check for competing claims. A third party acquiring a motor vehicle, by contrast, has no apparent further duty of inquiry beyond relying on what the face of the certificate of title says (or beyond following other procedures set out in the Act, which are discussed below).

- 16 -

assigned. *Id.*, § 501.114(c)(B). The assignor needs to surrender the original of the certificate of title

to the Department of Transportation, so that a new certificate reflecting the assignee's name and

address as lienholder can be prepared. *Id.*, § 501.114(c)(C), (d)(2). Once a new certificate is issued,

the assignee is rewarded with a statutory assurance that its perfection will relate back to the

perfection date of its assignor's lien. *Id.*, § 501.114(e). Taken together, the procedures confirm the

clear intent of the statute – a lien holder wanting to enjoy the benefits of recordation of its lien on

the certificate of title needs to be sure that the information on the certificate of title is accurate, and

that duty equally applies to assignees of liens. *See Nashua Mfg. Co. v. Hooper Trailer Sales, Inc.,*

445 F.2d 1321, 1222-23 (9th Cir. 1971) (ruling on a similar assignment recordation issue involving

accounts receivable under Idaho law).[21]

### C. Perfection of Liens in Motor Vehicles as against Judgment Creditors

We next take up how the contest between a notated consensual lienholder and a judgment

creditor seeking to execute on a motor vehicle plays out. When a judgment creditor executes its

judgment, it obtains a writ of execution which is delivered to the sheriff, who in turn seeks out

property of the debtor to sell.[22] When the sheriff encounters a motor vehicle, he may or may not be

able to acquire the certificate of title – there is no guarantee that the debtor will cooperate, or that

the debtor's representative would even know where the title to the vehicle is located. It is almost

certainly not in the vehicle. The Certificate of Title Act anticipates these realities, as it lays out a

procedure for the sheriff to obtain a new title. *See id.*, § 501.074(a)(5). The sheriff must first have

---

[21]Said the court: "We do not find appellant's arguments particularly persuasive. ... the Act is not a mere 'validation' statute ... Rather, although it does use the permissive word 'may,' it appears to set up a complete scheme under which assignees, by recording, can obtain protection against both bona fide purchasers and creditors. The clear implication would seem to be that, if an assignee wants such protection, he should follow the Act." *Id.*

[22]The debtor in this case is a company, not an individual, so special problems that might crop up when a claim of exemption is made do not arise in this context and will not be examined here.

a bill of sale in hand (reflecting the fact of a sale and the identity of the new purchaser). Thus, we know that the sheriff conducting a sheriff's sale is expected to sell the vehicle *without* a certificate of title in hand. In fact, the sheriff cannot even *apply* to the Department of Transportation for a new title until *after* the sale has been conducted. The sheriff has no practical or legal way of knowing of the existence of a prior security interest in the vehicle prior to selling, and apparently no need to know either. We also know that the purchaser at a sheriff's sale must know that it will get a new, clean and clear certificate (*i.e.*, one without lien notations), because it has no way of knowing whether there are any security interests against the vehicle at the time of sale (unless the sheriff happens to have the vehicle certificate in hand). The purchaser would otherwise be unable to make an intelligible offer for the vehicle (it would not know how to price for undisclosed liens). The statute in fact states that a new certificate of title is issued in the name of the new purchaser, with no mention of notation of prior security interests on the new title. *See id.*[23] Thus, the purchaser likely takes free of the consensual and properly notated lien.[24]

  But what of the judicial lienholder? The sheriff turns over the proceeds of sale to the judicial

---

[23]Compare to other parts of the Act, in which such prior interests *are* routinely noted, such as, for example, when someone claims the certificate has been lost and seeks a replacement. *See* TEX. TRANSP. CODE, § 501.134.

[24]We say "likely" because there is at least one case that suggests otherwise. *See General Motors Acceptance Corporation v. Byrd, Sheriff of Dallas County*, 707 S.W.2d 292, 296 (Tex.App. – Ft. Worth 1986, no writ). There, GMAC was the secured creditor. The sheriff repossessed a mobile home to satisfy a judgment lien creditor's claim, and apparently retrieved the title as well. It was thus aware of the existence of GMAC and gave it notice of the sale. GMAC appeared at the sale, and was the successful bidder. The title was transferred to GMAC but the proceeds were held by the sheriff, to be turned over to the judgment creditor. GMAC sought to enjoin the sheriff from paying the judgment creditor, but the court declined its request for injunctive relief, because it believed that it had a sufficient at-law remedy. It concluded that its lien continued in either the vehicle in the hands of a subsequent purchaser because, "GMAC could have foreclosed its interests and sold the motor home pursuant to sec. 9.504." *Id.* The case did not discuss the Texas Certificate of Title Act, which now provides that "in the event of a conflict between this section [*i.e.*, the section that governs sheriffs' sales of motor vehicles] and other law, this section controls." TEX. TRANS. CODE, § 501.074(d). Thus, the current version of the Texas Certificate of Title Act would appear to overrule this already questionable precedent. *See also Williams v. Cawthorn*, 237 S.W.2d 652 (Tex.Civ.App. – Amarillo 1950 no writ) (noting that the purposes of the Certificate of Title Act, first enacted in the 1930's was to cover the whole field of sales and liens on motor vehicles), *citing Motor Inv. Co. v. City of Hamlin*, 142 Tex. 486, 179 S.W.2d 278 (1944).

lien creditor, of course. None of these parties would necessarily know of the identity of *any* lienholders noted on the certificate of title, because it is not required that the sheriff have the certificate of title in hand as a precondition to repossessing and selling the vehicle. Indeed, it is precisely because the sheriff will in all likelihood *not* have the original certificate of title that this statute has to be in place. Otherwise, the sheriff would be at the mercy of the debtor, who could simply refuse to turn over the certificate of title (a judgment lien, after all, is not a search warrant).

The procedures laid out here are not appreciably different from what might occur with respect to the repossession and sale of other kinds of personal property. Certainly the sheriff would have no duty to review the Secretary of State filing records before repossessing and selling collateral. But there are differences both with respect to purchasers at a sheriff's sale and the judgment creditor. In the case of other kinds of property, for which a publicly searchable database of recorded security interests is available, a purchaser can (and in some jurisdictions would be expected to) review those records in order to price the property, taking into account lienholders of record.[25] There is no searchable database for lienholders on certificated vehicles, and arguably, therefore, no duty of inquiry that could be imposed on a purchaser of a vehicle at a sheriff's sale. The procedures for how a new certificate is issued in the sheriff's sale context buttress that conclusion.

But again what of the judgment lien creditor? Here again, a judgment lien creditor is presumed to be aware of prior perfected security interests in most other kinds of personalty, due to the public filing database. If that creditor nonetheless asks the sheriff to execute on an item of personalty so encumbered, then that creditor would then, at the least, have a duty to assure that the

---

[25]*See* Note, *Secured Creditors Holding Lien Creditors Hostage: Have a Little Faith in Revised Article 9*, 81 IND. L.J. 733, 735 (Spring 2006) (noting that, in some jurisdictions, the sale of property subject to the perfection rules in Revised Article 9 is deemed "subject to" perfected lien claims).

proceeds from the sale be applied first to the satisfaction of those duly perfected interests, on pain of conversion.[26]

The point to be made here, however, is that the *original* lienholder faces the same practical difficulties but has an advantage that the assignee who has not followed the rules does not. The lienholder's remedy would appear to be an action against the judgment lien creditor (once it is discovered that the vehicle has been sold), for conversion. In such an action, the properly notated original lienholder should have little difficulty prevailing, because it would have in hand the certificate of title showing it as the lienholder. The assignee, however, while it would hold the certificate of title, would not be reflected on the certificate as the lienholder of record. Perhaps the assignee would argue, in such an action (as Wells Fargo has argued here), that it is in fact the "true" holder of the lien, and that it need not have recorded its assignment because the UCC excuses it from doing so and the Certificate of Title Act makes recordation of the assignment merely optional. The problem for such an assignee (and for Wells Fargo here) is that Texas' Certificate of Title Act has a comprehensive and clear scheme for recordation of an assignment, one that makes it express that only by following that procedure will the assignee then succeed to its assignor's lien priority position relative to intervening creditors. *See* TEX. TRANS. CODE, § 501.114(e) ("The issuance of a certificate of title under Subsection (d) is recordation of the assignment. The time of the recordation of a lien assigned *under this section* is considered to be the time the lien was recorded under Section 501.113") (emphasis added).

This brings us to Wells Fargo's reliance on the commentary offered by the Permanent Editorial Board with regard to this issue. In 1994, the PEB issued Commentary No. 12, regarding

---

[26]*See generally* Russell J. Hakes, *A Quest for Justice in the Conversion of Security Interests*, 82 Ky. L.J. 837 (1993/1994) (discussing the difficulties of applying the conversion remedy as a means of enforcing relative rights between senior and junior creditors, including judgment lien creditors, under Article 9).

Section 9-302, the prior incarnation of section 9.310(c) of Revised Article 9. *See* PEB Commentary on the Uniform Commercial Code, Commentary No. 12 (American Law Institute 1994). The Board states that its commentaries are issued under the authority of the American Law Institute and the National Conference of Commissioners on Uniform State Laws, to offer guidance in interpreting and resolving issues raised by the UCC and its Official Comments. Wells Fargo says that Commentary No. 12 demonstrates the intention of the drafters of the UCC that, when perfection is governed by a certificate of title enactment, that enactment should only be read to apply to perfection issues, not assignment of perfected security interests. \

Wells Fargo has adequately stated the general thrust of this Commentary. However, Wells Fargo overstates its application to the law as it stands in Texas. Indeed, says the Commentary, to determine whether the "no filing" rule of the UCC relating to assignments applies to certificated vehicles,

> It is first necessary to ascertain whether the certificate of title statute applicable to the particular transaction contains provisions concerning an assignment of a security interest and, if so, whether such provisions relate to perfection.

PEB Commentary No. 12, at 6. The Commentary then discusses a variety of situations in which the state's certificate of title enactment might be ambiguous regarding assignment, or might not tie the assignment of a security interest to its perfection. While there is a strongly expressed policy in favor of continued perfection, there is also a recognition that, when a given state *has* been specific about tying assignment to perfection, the state enactment must be respected. *See* PEB Commentary No. 12, at 9. Texas did not enact the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act cited in the PEB Commentary. It did not enact § 22(b) of that uniform enactment either, which makes perfection of an assignment a mere option. Instead, Texas enacted a specific statute that makes

assignments optional *as to the assignor*, but is explicit in noting that, for the assignee to enjoy the perfected status of its assignor, it needs to comply with the procedures in section 501.114. *See* TEX. TRANSP. CODE, § 501.114(e).

Thus, in a contest between a judgment creditor with a judicial lien on a motor vehicle and an assignee who has failed to comply with the recordation procedures in section 501.114 of the Texas Transportation Code, this court concludes that the judicial lien creditor would prevail. As such the trustee in bankruptcy in an action under section 544(a)(1), who enjoys that hypothetical status, also prevails.

## D. *Other States' Statutes*

As a final note, the court declines Wells Fargo's invitation to consider other similar statutes from different states.[27] With respect to those states' legislators (and the courts that have attempted

---

[27] Specifically, Wells Fargo refers the court to statutes from Florida, Georgia, Michigan, Missouri, and New York. Those statutes are as follows:

> If the original lienholder sells and assigns his or her lien to some other person and *if such assignee desires to have his or her name substituted on the certificate of title as the holder of the lien,* the assignee *may,* after delivering the original certificate of title to the department and providing a sworn statement of the assignment, have his or her name substituted as the lienholder. . . .

FLA. STAT. ANN. § 319.27(6)(d) (2008) (emphasis added);

> The assignee *may, but need not to perfect the assignment,* have the certificate of title endorsed or issued with the assignee named as holder of a security interest or lien . . . .

GA. CODE ANN. §40-3-55(b) (2008) (emphasis added);

> The assignee *may* have the certificate of title indorsed with the assignee named as the holder of the security interest by providing the department with a copy of the assignment instrument *but the failure of the assignee to do so shall not affect the validity of the security interest of the assignment thereof.*

MICH. COMP. LAWS ANN. §257.238(b)(2) (2008) (emphasis added);

> An assignee under subsection 1 of this section *may, but need not to perfect*

to interpret each respective statute), this court finds it a dangerous and unnecessary exercise of statutory construction to use interpretations of other states' statutes to import meaning into *this* state's statutes. The Texas Certificate of Title Act is not an enactment of a uniform code, as is the Uniform Commercial Code. These other statutes contain materially different language and may potentially serve materially diverse interests. Such an exercise of statutory construction would only serve to create an ambiguity that, to the extent it exists, is fully reconcilable without resorting to these external sources. This court has no evidence that these states' legislative enactments had any effect on the enactment of the Texas Certificate of Title Act. For these reasons, the court declines Wells Fargo's invitation to consider other state statutes.

## V. CONCLUSION

Summary judgment in favor of the plaintiff is granted, for the reasons stated herein. Motion for summary judgment in favor of the defendant is denied, for the reasons stated. A separate form of order shall be furnished by the plaintiff trustee.

# # #

---

*the assignment,* have the certificate of title issued with the assignee named as lienholder . . . .

MO. ANN. STAT. §700.365(2) (2008) (emphasis added); and

The assignee *may, but need not to perfect the assignment,* have the certificate of title endorsed or issued with the assignee named as lienholder . . . .

N.Y. VEH. & TRAF. LAW § 2120(b) (McKinney 2008) (emphasis added).